MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
**THE702FIRM INJURY ATTORNEYS**
8335 West Flamingo Road
Las Vegas, Nevada 89147
Telephone:     (702) 776-3333
Facsimile:     (702) 505-9787
*E-Mail:*       *service@the702firm.com*

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice forthcoming within 14 days*)
**HILTON PARKER LLC**
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068
Telephone:     (614) 992-2277
Facsimile:     (614) 927-5980
*E-Mail:*       *gparker@hiltonparker.com*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| TYLA D., pseudonymously,<br><br>Plaintiff,<br>vs.<br><br>MGM RESORTS INTERNATIONAL;<br>MANDALAY RESORT GROUP, LLC;<br>MGM GRAND HOTEL, LLC;<br>LAS VEGAS SANDS CORP.; and<br>BOYD GAMING CORPORATION,<br><br>Defendants. | Case No. :<br><br>Judge:<br><br><br>**COMPLAINT**<br><br><br>**JURY DEMAND** |

Plaintiff TYLA D., by and through her attorneys, MICHAEL C. KANE, ESQ., BRADLEY J. MYERS, ESQ., and JOEL S. HENGSTLER, ESQ. of THE702FIRM and GEOFFREY C. PARKER of HILTON PARKER LLC, states as follows:

### PARTIES

1.      Plaintiff TYLA D. ("**Tyla**") is a natural person residing in Clark County, Nevada.

2.      Due to the sensitive and intimate nature of the issues in this case, Plaintiff asks the Court to enter a protective order under Nevada Rule of Civil Procedure 26(c): (1) permitting her to proceed under the pseudonym "TYLA D."; and (2) forbidding the parties from disclosing her identity to third parties without either her consent or the prior approval of the Court.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

1

3.      Defendant MGM RESORTS INTERNATIONAL ("**MGM**") is a Delaware corporation with its principal place of business in Clark County, Nevada.  On reference, MGM operated the Mandalay Bay Las Vegas ("the Mandalay Bay") and the MGM Grand Las Vegas ("the MGM Grand") casino resorts at all relevant times.

4.      Defendant MANDALAY RESORT GROUP, LLC ("**MRG**") is a Nevada limited liability company with its principal place of business in Clark County, Nevada.  On reference, MRG is a subsidiary of MGM.  If MGM did not directly operate the Mandalay Bay, then, on information and belief, MRG directly operated the Mandalay Bay.

5.      Defendant MGM GRAND HOTEL, LLC ("**Grand Hotel**") is a Nevada limited liability company with its principal place of business in Clark County, Nevada.  On reference, Grand Hotel is a subsidiary of MGM.  If MGM did not directly operate the MGM Grand, then, on information and belief, Grand Hotel directly operated the MGM Grand.

6.      Defendant LAS VEGAS SANDS CORP. ("**Sands**") is a Nevada corporation.  On reference, Sands operated the Venetian Resort Las Vegas ("the Venetian") at all relevant times.

7.      Defendant BOYD GAMING CORPORATION ("**Boyd**") is a Nevada corporation.  On reference, Boyd operated the Orleans Hotel & Casino ("the Orleans") at all relevant times.

8.      Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to this action.

## INTRODUCTION

Sin City

9.      From Prohibition to the present day, Las Vegas has long had a special reputation for catering to visitors' more disreputable tastes in ways no other city will.

10.      By the 1950s, Las Vegas was famous for catering to male vice, especially in the forms of gambling and prostitution.  "Sin City," as Vegas would soon be known, cultivated its image as *the* place for men to get away and enjoy themselves, free from the burdens of their families and the judgment of their communities.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

11.    Although prostitution had technically been illegal in Clark County since 1931, easy access to commercial sex remained key part of the city's allure for many male visitors.

12.    This was only possible because Vegas happily tolerated a nominally illegal yet nearly omnipresent commercial sex sector.  As late as the mid-1950s, the Clark County Sheriff still tolerated a brothel operating openly just a few miles off the Strip.  Even after the last openly acknowledged Clark County brothels closed, commercial sex in Vegas remained a matter of police concern only when its consequences spilled over to people not involved in the industry.

13.    Vegas's casinos openly welcomed, played into, and benefitted from Vegas's sexualized image.  For decades, the standard cover motif of *Fabulous Las Vegas*—the City's premier entertainment publication—was a scantily clad woman posing next to a swanky casino.

14.    Worse, Vegas casinos have long invited a discreet and sanitized segment of the city's extensive sex trade onto their gaming floors and into their guest rooms.

15.    As David Schwartz, Director of the Center for Gaming Research at UNLV puts it when discussing the 1950s, Vegas's casinos created a hierarchy of sex work that, "mirrors in many ways the socioeconomic world of the Strip. For high rollers, the select pit girls were available, much like comped rooms and other luxuries. For less well-connected players, the cocktail lounge prostitutes provided a similar service within the casino resort. Finally, for those who either had little money or whose predilections, violent or otherwise, could not be satisfied by the 'call girls' of the casino, streetwalkers represented the bottom of Las Vegas's prostitution hierarchy." SCHWARTZ, DAVID, SUBURBAN XANADU 61 (2013).

16.    This system of illegal yet openly tolerated prostitution greatly benefited the casinos because it ensured their male guests could always find the commercial sex that was one of Vegas's main draws, while at the same time it "kept the actual casino operators' involvement with prostitution to a minimum. At the most, casino managers would introduce high rollers to 'clean' prostitutes who would not attempt to rob or blackmail the player." *Id.*

17.    At the same time, the technical illegality of prostitution meant, "the casino[s] could have a free hand in ejecting 'undesirable' prostitutes from the premises." *Id.*

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

3

18.    Over the subsequent decades, shifting social mores and a push to broaden Vegas's appeal led casinos to demand greater discretion from the sex workers they invite in.

19.    But even today, the hierarchy the casinos pioneered decades ago remains largely intact:  A "clean" prostitute who doesn't make trouble is welcome in any casino on the Strip because they and their employees know cracking down on the trade would put them at a disadvantage versus more "tolerant" competitors.  And recent research shows casino employees still frequently earn generous kickbacks for connecting guests to sex workers.

20.    The casinos also continue to broadcast obvious hints about the sexual services available to their guests.  Perhaps the best example of this is the world-famous slogan: "What Happens Here, Stays Here" (a/k/a "What Happens in Vegas, Stays in Vegas").

21.    Created in 2003 under the aegis of the casino-dominated Las Vegas Convention and Visitors Authority ("LVCVA"), the slogan is intentionally ambiguous.  Its creators' stated goal was to remind viewers that Vegas has more to offer than gambling, while leaving the details to their imaginations.  But given Vegas's longstanding reputation, everyone involved must have known it would be interpreted by many as a thinly veiled promise to tolerate sex tourism.

22.    Certainly, that's how UNLV sociology professor Barb Brents, who studies Nevada's sex industry, interprets it.  *See* Lopez, Sandy, *Prostitution in Nevada has its advantages, experts say*, LAS VEGAS REVIEW-JOURNAL (July 7, 2016), www.reviewjournal.com/local/local-las-vegas/downtown/prostitution-in-nevada-has-its-advantages-experts-say/.

23.    So, when Vegas's casinos authorized and funded these ambiguous-yet-risqué ads for over 15 years (through 2018), they knew the promise they were making and did it anyway.

What Happens in Vegas

24.    Contrary to the comfortable myth spread by those who benefit from prostitution, there is no clean distinction between "consensual prostitution" and sex trafficking.

25.    Today, Nevada retains its status as the "symbolic center of the commercial sex industry."  Heineman, Jennifer et al., *Sex Industry and Sex Workers in Nevada*, SOCIAL HEALTH OF NEVADA, 1 (2012), *available at* digitalscholarship.unlv.edu/social_health_nevada_reports/48.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

26.    It is no coincidence that Nevada is also the State with the second-highest rate of human trafficking. *Human Trafficking Statistics by State 2024*, WORLD POPULATION REVIEW (last accessed Jan. 15, 2024), *available at* https://worldpopulationreview.com/state-rankings/human-trafficking-statistics-by-state.

27.    The FBI calls Las Vegas one of 13 "High Intensity Child Prostitution Areas." *Non-Cyber Sexual Exploitation of Children*, OFFICE OF THE INSPECTOR GENERAL (Jan. 2009), *available at* https://oig.justice.gov/reports/FBI/a0908/chapter4.htm#122.

28.    Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves.  Figures vary, but most studies find half or more of prostitutes work under the control of a pimp.  *See* Williamson, Celia and Clouse-Tolar, Terry, *Pimp-Controlled Prostitution, Still an Integral Part of Street Life*, VIOLENCE AGAINST WOMEN, Vol. 8 No. 9, 1074–1092, at 1074 (Sept. 2002) (citing studies giving figures as high as 80%).

29.    Tyla, the Plaintiff in this case, spent years under the thumbs of a series of pimps in Las Vegas and, briefly, Los Angeles.  During that time, the pimps who controlled her each threatened her, beat her, raped her, forced her to have sex with strange men, took all or nearly all her earnings, held onto some or all of her identification documents, controlled her access to basic needs like food and housing, and had her watched at all times.

30.    Tyla's victimization began at age fourteen, after she ran away from home and found herself desperate enough to accept a strange man's offer of shelter and protection.  She never wanted to be a sex worker, but the choice—and her childhood—were taken from her.

31.    Sadly, Tyla's story is far from unique.  In fact, nearly all pimp-controlled prostitutes—and so likely a majority of all prostitutes—are the victims of coercion.

32.    For a start, it is standard practice for pimps to take all or nearly all of the money earned by the women and girls they control.  The pimps then use the money to pay for their victims' needs only as and when it suits them.  This creates total dependence, both practical and psychological, on the pimp.  *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

33. In addition to total financial dependence, pimps control their victims through a mixture of other means that varies from pimp to pimp. Physical violence is a common component. *See* Williams & Clouse-Tolar (2002), at 1085 ("The extent to which women felt threatened by a pimp was, in part, a function of her evaluation of the likelihood that he will become physically violent. This threat had been realized by all of the women in the study.")

34. Other common components include renting victims' housing in the pimp's name, retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps, and threatening to separate victims from their children if they disobey or try to leave.

35. As a result, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences. On reference and belief, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

36. All Defendants know or should know these basic facts about the nature of the sex trade that they welcome into their properties. At the very least, all must be aware that some significant proportion of the prostitutes whom they permit their guests to patronize—and permit their employees to assist guests in patronizing—are, in fact, human trafficking victims.

37. To the extent that they claim not to know *which* prostitutes are victims and which are working for themselves, Defendants can make that claim only because they have taken steps to avoid finding out.

**BACKGROUND**

Tyla's Trafficking

38. In about 2004, when Tyla was twelve years old, she learned that her mother had been lying to her about who her father was.

39. Tyla didn't take it well. Soon, she ran away from home for the first time.

40. Although Tyla returned safely that time, she wouldn't always be so fortunate.

41. In about 2006, when Tyla was fourteen, she ran away for the second or third time.

42. This time, when Tyla was hanging around by herself at a gas station, Rashawn A.[1] noticed her.

43. Rashawn A. offered to let Tyla stay at his house, where he said he lived with his wife and their daughter.

44. But when Tyla got into her car, Rashawn A. drove her to a barbershop run by Westbrook.[2]

45. Rashawn A. left Tyla at the barbershop, promising to pick her up later.

46. At the end of the day, Rashawn A. still hadn't returned, but Westbrook offered to let her stay in a motel room he had rented. After talking to Rashawn A. using Westbrook's phone and being told that he would pick her up the next day, Tyla reluctantly agreed.

47. When Westbrook brought Tyla to the motel room, there was already a much older girl staying in the room. Westbrook left them together.

48. The next morning, Tyla called Rashawn A. using the hotel phone, and Rashawn A. told her he would pick her up later in the day.

49. Tyla was getting scared, so she told the other girl she needed to go to the store.

50. The other girl told Tyla she couldn't leave. When Tyla asked why, the girl said, "You just can't."

51. Tyla tried to use the hotel phone again, and the girl immediately unplugged it from the wall.

52. Tyla asked what the girl was doing, and she responded by asking Tyla, "Do you even know what you're here for?"

53. Tyla didn't know, so the girl explained: Tyla was property now, and she was there to make money for Rashawn A. and Westbrook.

54. It wasn't long before they forced her to have sex with a strange man for the first time—and to hand over the money to them.

---

[1] Rashawn A. is a pseudonym, used because naming this person would be futile and because Tyla fears retaliation.
[2] Westbrook is a pseudonym, used because this person's true name is unknown and because Tyla fears retaliation.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

55. After that, Tyla spent most of the next year and a half being forced to engage in commercial sex for the benefit of a series of pimps, most of whose names she never learned or can no longer remember. Tyla's "ownership" changed hands whenever, in her naivety, she spoke to (or simply made eye contact with) the wrong man.

56. For about three months of that time, Tyla was trafficked in a temporary housing facility in Los Angeles. But for most of it, she was trafficked in Las Vegas, where her traffickers forced her to walk the carpets of various casinos.

57. In particular, they made her walk the carpet many times each at the MGM Grand, the Mandalay Bay, and the Venetian—as well as the Caesar's and the Planet Hollywood, which were owned and operated by non-parties Desert Palace LLC and PHW Las Vegas LLC.

58. Although her traffickers got her a fake I.D. in the name of "Naina Santiago," Tyla didn't look eighteen, let alone twenty-one. She looked like what she was, a lost and frightened fourteen- (and eventually fifteen-) year-old girl, dressed up for sex appeal by an older man.

59. Still, Tyla had no trouble entering the casinos and making her way onto their gaming floors, where she would habitually seat herself at a slot machine by the elevators and spend as long as possible gambling away just a few dollars. She did this dozens of times while she was being trafficked as a teenager.

60. When Tyla waited by the elevators like that, male casino guests looking for commercial sex had no trouble figuring out why she was there.

61. On information and belief, neither did the casinos' employees and managers.

62. In about 2007, roughly six months after her fifteenth birthday, Tyla was arrested and placed in the Caliente Youth Center for correctional care. That broke her free for a while.

63. Unfortunately, her freedom didn't last forever.

64. In about 2013, not long before she turned twenty-one, Tyla moved in with Keith A.[3], whose street name "Knockout" referred to his strength and boxing prowess.

65. "Knockout" soon became physically abusive and demanding. He forced her to earn money for him, at first just by exotic dancing, then later by walking the carpet in casinos.

---

[3] Keith A. is a pseudonym, used because naming this person would be futile and because Tyla fears retaliation.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

66. For about three months, "Knockout" controlled Tyla's life completely.

67. "Knockout" took the money she earned and insisted that purchases go through him.

68. If Tyla tried to take a night off of walking the carpet, "Knockout" would hit her.

69. During this time "Knockout" would drop Tyla off at the casinos where she was to work, particularly including the MGM Grand, the Mandalay Bay, and the Orleans.

70. Just like when she was younger, the reason Tyla entered the casinos was obvious from her dress and her manner, yet she had no trouble entering or getting onto the gaming floors.

71. She also had no trouble returning to the routine of seating herself at a slot machine by the elevators and stretching a few dollars as she waited for male casino guests to notice her. She did this many times during the three months she spent at "Knockout"'s mercy.

72. Again, when Tyla waited by the elevators like that, male casino guests looking for commercial sex had no trouble figuring out why she was there.

73. Again, on information and belief, neither did the casinos' employees.

74. On information and belief, by this time all of Defendants used sophisticated facial recognition software, with which they monitored their properties' omnipresent security cameras, particularly at casino entrances.

75. One major purpose of this facial recognition software was to assist their security staff in turning away persons Defendants considered undesirable.

76. It did this by flagging such persons wherever they were spotted in the casinos and alerting security personnel.

77. On information and belief, Defendants' facial recognition software was able to (and did) recognize and flag Tyla as a suspiciously frequent visitor to each casino.

78. On information and belief, Defendants' security employees ignored the flag on Tyla because they understood Defendants' policy that only undesirable or disruptive sex workers should be singled out, and then only to be turned away or ejected.

79. On information and belief, security personnel at all four casinos became aware on multiple occasions that Tyla was visiting (or had just visited) their casino for the purpose of engaging in commercial sex.

80. Additionally, because Defendants' security employees were perforce more familiar with the sex industry than an average member of the public, they would have been aware that many, or even most, prostitutes are underage or are victims of coercion.

81. Thus, on information and belief, the employees knew Tyla was being trafficked.

82. Nevertheless, the employees turned a blind eye to Tyla's plight because to do otherwise would have inconvenienced the employees and potentially upset her clients (and the casinos' guests) who often came to Las Vegas for its reputation for tolerating commercial sex.

83. On information and belief, this willful blindness was intentionally fostered by Defendants in order to please their clientele and so pad their bottom lines.

84. Additionally, this willful blindness was likely encouraged by Defendants' desire to draw a sharp line between acceptable "consensual prostitution" and human trafficking that in a way that places nearly all prostitutes on the "consensual" side of the line.

85. On information and belief, to the extent that Defendants gave their employees any training on recognizing human trafficking, that training strongly emphasized the idea that most prostitution is consensual, and thus that employees should only take action (or report to their superiors) if they witnessed clear direct evidence of severe physical abuse.

86. After three months of abuse, Tyla finally worked up the courage to risk leaving "Knockout" and returning to her family.

87. This time, she managed to stay free for good.

### Tyla's Ongoing Suffering

88. After she escaped, Tyla couldn't believe that anyone would take a story like hers seriously, let alone that she could have a chance at justice.

89. This mental block was built and strengthened by her experiences and the words of other girls she met in "the game," all of which had taught her that no one cared what happened to sex workers.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

90. Tyla's traffickers intentionally fostered Tyla's belief that even women like her who had been forced into sex work as children were undeserving of justice—and that nobody would ever take them seriously.

91. Defendants also created a climate in the Las Vegas area of disregarding and trivializing the suffering of sex workers, in particular by consistently characterizing sex workers as criminals and themselves as the real victims.

92. In the years that immediately followed her escape, Tyla had nightmares about her experiences being trafficked four or five times a week. Even today, she still gets them at times.

93. It wasn't late 2023 that Tyla saw the advertisement that broke through and let her conceptualize herself as a victim so that she was finally able to bring herself to speak to an attorney about what had happened to her. She brings this complaint just a few months later.

### COUNT I: 18 U.S.C. § 1595 ("TVPRA")

94. Plaintiff incorporates each foregoing and subsequent allegation.

95. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

96. Through their acts and omissions described above, Defendants are "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a)(1 & 2), and they are thus subject to both direct and beneficiary liability under 18 U.S.C. § 1595.

97. Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

### COUNT II: 18 U.S.C. § 2255(A), CHILD ABUSE VICTIMS' RIGHTS ACT ("CAVRA")

98. Plaintiff incorporates herein each foregoing and subsequent allegation.

99. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

100. Plaintiff was the "victim" of violations of 18 U.S.C. § 1591.

101. Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

11

102. Through their actions described above, Defendants are "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a)(1 & 2), and they are thus subject to direct liability under 18 U.S.C. § 2255.

103. Through their actions described above, Defendants are also subject to beneficiary liability under 18 U.S.C. § 2255.

104. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Hospitality Defendants' properties.

## COUNT III: NRS 41.1399

105. Plaintiff incorporates each foregoing and subsequent allegation.

106. Plaintiff is a victim of human trafficking in the meaning of N.R.S. 41.1399(10)(a).

107. Through their actions described above, Defendants were responsible for Plaintiff's trafficking within the meaning of N.R.S. 41.1399(1).

108. Through their actions described above, Defendants profited from Plaintiff's trafficking within the meaning of N.R.S. 41.1399(1).

109. Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under N.R.S. 41.1399.

## COUNT IV: NRS 41.13965

110. Plaintiff incorporates herein each foregoing and subsequent allegation.

111. Defendants knowingly benefited, financially or by receiving anything of tangible value, from participation in a venture which they knew or should have known has engaged in the sexual abuse and exploitation of Plaintiff, who they knew or should have known was underage.

112. Defendants are liable for knowingly assisting and gaining a benefit from the sexual abuse and exploitation of Plaintiff, and they are thus liable to Plaintiff for treble damages.

113. To the extent a Defendant is an establishment with more than 175 rooms available, that Defendant still benefited from, upon information and belief, increased foot traffic in its establishment; increased gambling revenues; ATM fees; kickbacks from third parties for selling the Internet and Wi-Fi usage data of johns and pimps; the sale of intoxicating liquors used in the

sex trafficking industry.

### COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

114. Plaintiff incorporates each foregoing and subsequent allegation.

115. Defendants' intentional acts and omissions, as described above, were extreme and outrageous to the point of being intolerable in a civilized society.

116. Plaintiff suffered severe emotional distress and permanent psychological injuries as a result of Defendants' intentional acts and omissions, and she is therefore entitled to damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits and/or restitution;

c. Punitive damages, attorneys' fees, and expenses;

d. The costs of this action;

e. Pre- and post-judgment interest; and

f. Any other relief the Court or jury deems appropriate.

///

///

///

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

13

DATED this 10th day of April, 2024.

**THE702FIRM**

**/S/ MICHAEL KANE**

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
8335 West Flamingo Road
Las Vegas, Nevada  89147

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice forthcoming*)
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

*Attorneys for Plaintiff Tyla D.*

**DEMAND FOR JURY TRIAL**

Plaintiff Tyla D., by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED this 10th day of April, 2024.

THE702FIRM

/S/ MICHAEL KANE

_____
MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
8335 West Flamingo Road
Las Vegas, Nevada 89147

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice forthcoming*)
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

*Attorneys for Plaintiff Tyla D.*